IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE ROSSI, | ) | CASE NO. 1:25-CV-00625-DCN |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | JENNIFER DOWDELL |
| SOCIAL SECURITY, | ) | ARMSTRONG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Christine Rossi ("Ms. Rossi") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated March 31, 2025). For the reasons set forth below, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

## II.    PROCEDURAL HISTORY

On August 30, 2021, Ms. Rossi filed her applications for DIB and SSI. (Tr. 180, 187). Ms. Rossi's applications related to her back pain, leg pain, possible fibromyalgia, and mental health problems. (Tr. 219).

The Social Security Administration ("SSA") denied Ms. Rossi's applications initially and upon reconsideration. (Tr. 62, 72, 82, 93). Ms. Rossi requested a hearing before an administrative

law judge ("ALJ"). (Tr. 129). The ALJ held a hearing on October 11, 2022, at which Ms. Rossi was represented by counsel. (Tr. 36). Ms. Rossi testified, as did an impartial vocational expert ("VE"). On November 15, 2022, the ALJ issued a written decision, finding that Ms. Rossi was not disabled. (Tr. 12). The ALJ's decision became final on August 23, 2023, when the Appeals Council declined further review. (Tr. 1).

Ms. Rossi filed a complaint in this Court challenging the Commissioner's final decision, in a case captioned *Rossi v. O'Malley*, 1:23-CV-02061-DCN. On April 2, 2024, the Court remanded the case to the Commissioner pursuant to a stipulation between the parties. (Tr. 1456-1460). On May 30, 2024, the Appeals Council remanded the case to the ALJ, instructing the ALJ to provide an adequate evaluation of whether Ms. Rossi could perform work existing in significant numbers in the national economy. (Tr. 1462).

On December 4, 2024, the ALJ held a second hearing, at which Ms. Rossi and a VE testified. (Tr. 1408). On January 16, 2025, the ALJ issued a written decision, again finding that Ms. Rossi was not disabled. (Tr. 1386).

On March 31, 2025, Ms. Rossi filed her complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Rossi asserts the following assignments of error:

(1) The ALJ erred at Step Two of the Sequential Evaluation when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(2) The ALJ erred when he failed to properly evaluate Plaintiff's headaches and find that she equaled Listing 11.02B.

(3) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms, including pain, precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 7, PageID # 2592).

III.     **BACKGROUND**

A.     <u>**Personal, Educational, and Vocational Experience**</u>

Ms. Rossi was born in 1990 and was 30 years old on the alleged onset date. (Tr. 180, 1400). She is married and has three minor children. (Tr. 181). Ms. Rossi has a high school diploma and attended some college. (Tr. 220). She has no prior relevant work experience. (Tr. 1400).

B.     <u>**Relevant Hearing Testimony**</u>

*1.*     ***Ms. Rossi's Testimony***

At the October 11, 2022 hearing, Ms. Rossi testified that she has not worked since 2020, when she had her son and began experiencing significant back pain. (Tr. 41). She also testified that she experiences pain all over her body as a result of her fibromyalgia. (Tr. 42). She testified that she has tried a variety of treatments for the pain, including various medications and physical therapy but that most of the treatments have not worked. *Id*. She also testified that chiropractic care has helped her a little bit, and that the only medication that has worked for her is medical marijuana. *Id*. She furthered testified that she is only able to sit for 30 minutes at a time before she needs to stand in light of her back pain. (Tr. 44-45). Ms. Rossi also testified that she cannot bend over, squat, or stand without experiencing lightheadedness to the point that she almost passes out. (Tr. 44). She testified that she needs to sit down and let the dizziness pass, and that she needs to take breaks throughout the day. *Id*. She further testified that she sees a therapist once or twice a week for mental health issues, including bipolar disorder, ADHD, and PTSD. (Tr. 42-43).

At the December 4, 2024 hearing, Ms. Rossi testified that her headaches and dizziness had gotten worse since the prior hearing. (Tr. 1413). She testified that she gets headaches almost every day, and that her dizzy spells affect her to the point that she can barely stand up and walk through the house. *Id*. She also testified that her headaches typically last all day and stay at the same intensity throughout the day. (Tr. 1413-14). She further testified that medication helps her

3

headaches a small amount, but that the only thing that really helps is lying down and going to sleep. (Tr. 1414). Ms. Rossi also testified that her back pain radiates down her legs and causes them to go numb. (Tr. 1414-15). She testified that every day is different, and that sometimes she can stand for five minutes before experiencing numbness, while on other days she can stand for an hour. (Tr. 1415). She also testified that lying down helps with her back pain. *Id*.

Ms. Rossi testified that she does not take gabapentin or any other medicine for her fibromyalgia because none of the medications have worked. (Tr. 1416). She testified that, while her doctors would like to perform back surgery, it could make her fibromyalgia worse, so the doctors are recommending that she wait as long as she can before having surgery. *Id*. She also testified that she is currently seeing a chiropractor 15 times per year, which sometimes helps. (Tr. 1416-17). With respect to mental health issues, Ms. Rossi testified that her depression has gotten worse and that she is taking Prozac and seeing a therapist weekly and a psychiatrist every three months. (Tr. 1417-18). She testified that she does not believe she can work in light of her mental health issues because she cannot concentrate or get along with others. (Tr. 1418).

### 2.    *Vocational Expert's Testimony*

At the December 4, 2024 hearing, the ALJ asked the VE to consider a hypothetical individual with Ms. Rossi's age, educational background, and work experience who was limited to light work and could only stand and walk for four hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; must avoid unprotected heights, dangerous machinery, and commercial driving; could perform simple tasks and follow simple instructions with few if any workplace changes; could not handle strict production quotas or assembly line work; and was limited in interactions with others to simple, work-related decisions without arbitration, negotiation, or supervision. (Tr. 1420). The VE testified that the hypothetical individual could perform jobs existing in significant numbers in

the national economy, including work as an order caller, collator operator, and interviewer. (Tr. 1421).

The ALJ next asked if the hypothetical individual could perform those jobs if the individual could not stand or walk for four hours without taking intermittent, unscheduled breaks that would result in the individual being off task for at least 20 percent of the workday. *Id*. The VE testified that a 20 percent off-task rate would be work-preclusive. *Id*. In response to a question from Ms. Rossi's counsel, the VE also testified that it would be work-preclusive if the individual would be absent from work two days per month. (Tr. 2422).

### C.    Relevant Opinion Evidence

#### 1.    *State Agency Medical Consultants*

On October 27, 2021, Mehr Siddiqui, M.D., a state agency medical consultant, opined that Ms. Rossi could perform light work, but could only stand and/or walk for a total of four hours per workday and could only sit for approximately six hours per workday. (Tr. 67-68). On March 8, 2022, Lynne Torello, M.D., largely concurred with Dr. Siddiqui's opinions on reconsideration. (Tr. 88-89). However, Dr. Torello opined that additional postural and environmental restrictions were warranted. (Tr. 89). In particular, Dr. Torello opined that Ms. Rossi could never climb ladders, ropes, or scaffolds and could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl. (Tr. 88). Dr. Torello also opined that Ms. Rossi should avoid all work hazards, unprotected heights, and hazardous machinery. *Id*.

The ALJ found that Dr. Torello's opinions were persuasive but that the evidence showed that Ms. Rossi was more limited than Dr. Siddiqui had opined. (Tr. 1399).

#### 2.    *State Agency Psychologists*

On December 28, 2021, Courtney Zeune, Psy.D., a state agency psychologist, opined that Ms. Rossi was moderately limited in her ability to carry out detailed instructions, maintain

5

attention and concentration for extended periods, complete a normal workday and workweek, interact with the public, accept instructions and respond to criticism, get along with coworkers or peers, and respond appropriately to changes in the workplace setting. (Tr. 69). Dr. Zeune also opined that Ms. Rossi could perform short cycle work tasks in a setting with flexible pace and production requirements, interact superficially with coworkers in a setting with infrequent public contact, and adapt to a routine work setting where changes were infrequent. *Id*. On March 5, 2022, Karla Delcour, Ph.D., concurred with Dr. Zeune's opinions on reconsideration. (Tr. 90).

The ALJ found that the opinions of the state agency psychologists were persuasive overall, but that Ms. Rossi was less limited in her ability to interact with coworkers, and instead could perform simple work-related decisions without arbitration, negotiation, or supervision. (Tr. 1399).

### 3.    *Melissa Lanza, Ph.D.*

On December 13, 2021, Ms. Rossi underwent a psychological evaluation with Dr. Lanza as part of her disability claim. (Tr. 486). Dr. Lanza opined that Ms. Rossi's long-term memory recall was expected for her age and that her short-term memory was worse than expected. (Tr. 491). Dr. Lanza also opined that Ms. Rossi did not appear to have any difficulty with maintaining attention and concentration but that she would be expected to have limited ability to sustain attention sufficient to perform multi-step tasks. *Id*. Dr. Lanza further opined that Ms. Rossi was polite and cooperative but reported that she is easily irritated and agitated. *Id*. Dr. Lanza concluded that Ms. Rossi would have some limitations in her ability to respond to supervisors, coworkers, and the public. *Id*. Finally, Dr. Lanza opined that Ms. Rossi was limited in her ability to respond appropriately to normal work pressures in a competitive work setting. *Id*.

The ALJ found that, while some of Dr. Lanza's opinions were vague, her opinions were persuasive and consistent with the evidence. (Tr. 1399).

#### D.    Relevant Medical Evidence

##### 1.    *Physical Impairments*

On March 2, 2021, Ms. Rossi had an initial appointment with a physical therapist for her back pain. (Tr. 325). She rated the pain as a seven out of ten, and said that her baseline pain from fibromyalgia was a three or four out of ten. (Tr. 327). She also reported that the pain was worse if she stood for more than five minutes, sat for more than 15 minutes, stood up from a sitting position, climbed stairs, carried or lifted her baby, or bent over. *Id*. She further reported that medication and heat helped her pain. *Id*. It was noted that she would benefit from therapy to decrease pain, increase her range of motion, increase strength, and increase functional tolerance. (Tr. 328). It was also noted that her prognosis was good. *Id*.

Ms. Rossi had a visit with an orthopedist on March 31, 2021. (Tr. 314). She reported that she was struggling with bilateral hand pain and numbness. *Id*. She also reported that she had been dropping objects and that she could not feel her feet. *Id*. On examination, Ms. Rossi displayed a normal gait and normal strength in her extremities, except for mild weakness on finger abduction. (Tr. 316). She was informed that she needed to obtain an MRI to assist in diagnosis and treatment. (Tr. 317).

On April 3, 2021 and April 5, 2021, Ms. Rossi underwent two MRIs of her spine, which showed bilateral spondylolysis at L5-S1 but no cervical spinal canal or foraminal stenosis. (Tr. 415-20).

Ms. Rossi had a follow-up visit with her orthopedist on April 21, 2021 to review the results of her MRIs. (Tr. 306). She reported that she continued to experience unrelenting back pain. (Tr. 307). It was noted that an MRI of her cervical spine revealed no significant stenosis, while an MRI of her lumbar spine revealed bilateral spondylolysis at L5-SI with grade 1 isthmic spondylolisthesis of L5 on SI, moderate degenerative disc disease, and bilateral foraminal

encroachment. *Id*. Ms. Rossi's physician discussed surgical options with her, but she decided to wait until after an upcoming vacation. (Tr. 308). She was referred for an injection. *Id*.

On August 10, 2021, Ms. Rossi presented to Nora Serghany, M.D., complaining of diffuse pain throughout her joints. (Tr. 290). Ms. Rossi reported that the pain began in May of that year, and that she had pain in her wrists, elbows, knees, hips, and ankles. *Id*. Ms. Rossi also reported occasional numbness in both feet. *Id*. She further reported that she had experienced chronic back pain for years, which had worsened after she gave birth in July 2020. *Id*. She reported receiving a lumbar epidural, which provided relief for a few months. *Id*. She said that medical marijuana partially mitigated her symptoms. *Id*. On examination, Ms. Rossi displayed full range of motion without swelling or warmth, but with tenderness to palpitation in both wrists, tenderness in her spine, and bursitis on her left hip. (Tr. 294). She was diagnosed with bilateral ankle pain, obesity, chronic lumbar pain with spondylolisthesis at L5-S1, and fibromyalgia. (Tr. 295). She was instructed to increase her dosage of Tylenol. (Tr. 296). On August 12, 2021, Dr. Serghany noted that Ms. Rossi's labs, history, and physical examination were negative for inflammatory arthritis, and suggested that she lose weight to decrease pain on her joints. (Tr. 289).

Ms. Rossi had a follow-up visit at MetroHealth on September 9, 2021. (Tr. 505). She reported ongoing lower back pain, which she characterized as sharp, stabbing, and exacerbated by bending and prolonged standing. (Tr. 506). She reported that heat and Epsom salt baths provided relief. *Id*. She was diagnosed with chronic spondylogenic low back pain secondary to a grade 1 spondylolisthesis at L5-S1 and mechanical factors, including a weak core and obesity. (Tr. 510). It was also noted that her fibromyalgia complicated the case. *Id*. She was instructed to continue with a daily home exercise program. *Id*. It was noted that there were no obvious medication options for her fibromyalgia, as she had already tried gabapentin and other drugs and was not interested in another medication. *Id*.

On May 24, 2022, Ms. Rossi presented to MetroHealth, complaining of lightheadedness when bending over, which sometimes triggered nausea. (Tr. 551). Ms. Rossi also reported experiencing approximately two headaches per month, which she said she successfully aborted by taking Imitrex when she remembered to take it soon enough. *Id*. It was noted that her dizziness was most likely related to medication, and the delivery mechanism of her medication was changed. (Tr. 552).

Ms. Rossi had a follow-up appointment at MetroHealth regarding her lightheadedness and incontinence on June 7, 2022. (Tr. 550). She reported that medication changes had been effective to control her incontinence but that she continued to experience lightheadedness with postural changes. *Id*. She also reported that she was not experiencing dizziness and that she had not passed out. *Id*.

Ms. Rossi had another follow-up visit on June 15, 2022. (Tr. 548). She continued to report ongoing lightheadedness, though she again said that she had never passed out. *Id*. She also denied numbness, tingling, weakness, changes in bowel or bladder function, or changes in vision and balance. *Id*. She reported left wrist pain. *Id*. She was diagnosed with De Quervain's tenosynovitis in her left wrist and counseled on using a brace. (Tr. 549). Her treating physician also noted that he suspected her lightheadedness was caused by low blood pressure. *Id*. He instructed her to eat a higher salt diet. *Id*.

On June 22, 2022, Ms. Rossi presented to the Cleveland Clinic for a second opinion regarding her lower back pain. (Tr. 577). On examination, she displayed a normal range of motion and gait, but also displayed pain with palpation over her L3-S1 paraspinous muscles. (Tr. 581). She was diagnosed with spondylolysis and spondylolisthesis of the lumbar region, chronic low back pain with bilateral sciatica, osteoarthritis of the left hip, degeneration of lumbar intervertebral disc, myalgia, and fibromyalgia. (Tr. 582). She discussed treatment options with her physician,

including medication, non-surgical, and surgical options, and opted to continue with non-surgical care. *Id*.

On July 19, 2022, Ms. Rossi had a telehealth follow-up regarding her lightheadedness. (Tr. 571). She reported that increased salt intake had not improved her symptoms. *Id*. It was noted that she had been prescribed compression stockings but had not yet begun wearing them as they were delivered the day before. *Id*. It was also noted that Ms. Rossi's migraines were well-controlled. *Id*.

Ms. Rossi had a neurology appointment on November 29, 2022 with Michael F. Bahntge, M.D. (Tr. 2010). She reported experiencing dizziness spells beginning in 2020. *Id*. She said that the symptoms lasted from a few seconds to 20 minutes and that they occurred after she stood up and when she bent forward. *Id*. She denied experiencing tinnitus or otalgia, but reported aural fullness and pressure in both ears. *Id*. She also described her migraines as bifrontotemporal or occipital including a throbbing, sharp pain, nausea, dizziness, paresthesia/numbness, and muscle weakness. (Tr. 2010-11). She stated that she was experiencing migraines more frequently recently and had them once or twice per week, and that they could be triggered by stress, missing sleep, skipping meals or caffeine, and changes in weather. (Tr. 2011). She reported that she took acetaminophen or sumatriptan for her migraines. *Id*. Dr. Bahntge determined that Ms. Rossi's dizziness was likely caused by lightheadedness rather than vertigo. (Tr. 2014).[1]

Ms. Rossi went to the emergency room on August 9, 2023, complaining of a migraine headache. (Tr. 1605). She reported that the headache had persisted for five days and that her medication had not helped. *Id*. She was given a headache cocktail, which improved her symptoms. (Tr. 1608).

On November 3, 2023, Ms. Rossi presented to the Cleveland Clinic Heart and Vascular Institute, complaining of dizziness and palpitations. (Tr. 1902). She stated that her symptoms were

---

[1] Ms. Rossi states that Dr. Bahntge found that she had migraine vertigo. That is incorrect, as Dr. Bahntge expressly stated that he did not believe Ms. Rossi had migraine vertigo. (Tr. 2015).

unchanged and that she had dizziness with exertion. *Id*. A stress test was aborted due to dizziness. *Id*. It was recommended that she undergo an angiography to check for coronary artery disease and an aneurysm. (Tr. 1904). An echocardiogram was ordered as well. *Id*.

Ms. Rossi presented to the Cleveland Clinic neurology department on February 14, 2024 for an evaluation of her headaches. (Tr. 1801). She reported that she sometimes had migraines along with her dizziness and that she also experienced numbness and tingling in her hands and feet. *Id*. A physical examination was normal. (Tr. 1803).

Ms. Rossi went to the emergency room on February 21, 2024, complaining of dizziness, nausea, and bilateral ear fullness, which was greater on her left side than her right. (Tr. 1781). On examination, her left tympanic membrane was erythematous and bulging with a small effusion. (Tr. 1786). Ms. Rossi went to the emergency room again on February 26, 2024, complaining of blurred vision. (Tr. 1715). It was determined that her blurred vision was likely a side effect of a scopolamine patch. (Tr. 1719).  Ms. Rossi underwent an MRI of her brain on March 6, 2024, which did not reveal any abnormal results. (Tr. 1663-64).

Ms. Rossi had a follow-up neurology visit on October 2, 2024, at which she reported worsening dizziness over the course of three years. (Tr. 1627). She also reported experiencing migraines since she was young. *Id*. She stated that the migraines lasted for an unknown duration and caused her to feel off balance but did not cause falls. *Id*.

Ms. Rossi went to her primary care provider on October 9, 2024 for an annual physical. (Tr. 1597). She continued to report ongoing dizziness. *Id*. It was noted that she had an upcoming CT scan of her head and a lumbar puncture to test for idiopathic intracranial hypertension. *Id*. She also reported a constant headache that sometimes caused problems with her balance but did not cause issues with her vision, walking, or hearing. *Id*. She reported that she had experienced five migraines per week for the past few weeks. *Id*. She also reported that medicine did not help her

migraines but that lying down sometimes did. *Id*. On examination, Ms. Rossi displayed difficulty with heel to toe walking. (Tr. 1598). At telehealth psychotherapy sessions on October 29, 2024 and November 12, 2024, Ms. Rossi had to lie down because of migraines. (Tr. 2553, 2557).

### 2. *Mental Health Impairments*

Ms. Rossi underwent a diagnostic assessment on June 3, 2021. (Tr. 2157). She reported that she was seeking counseling after protective services became involved with her six-year-old daughter. *Id*. Ms. Rossi reported that she had previously been hospitalized two or three times after assaulting her boyfriend. (Tr. 2160). Her mental status examination was normal. (Tr. 2160-61). She was diagnosed with posttraumatic stress disorder ("PTSD"), bipolar disorder, and ADHD. (Tr. 2163).

On April 25, 2023, Ms. Rossi was depressed and stressed. (Tr. 2382). It was noted that she had made some success in accessing her anger management skills. (Tr. 2383). At an October 16, 2023 follow-up session, Ms. Rossi's mental status exam was unremarkable. (Tr. 2120). Her mood was assessed as stable, and her medication regimen was continued. *Id*. On April 18, 2024, Ms. Rossi reported low motivation and difficulty concentrating. (Tr. 2105). On June 20, 2024, she rated her anxiety and depression as a four out of ten. (Tr. 2093).

At an August 15, 2024 follow-up visit, Ms. Rossi reported that she was moderately depressed and that she was anxious throughout the day. (Tr. 2087). She stated that her psychological symptoms were manageable and that she was compliant with medication. *Id*.

On October 8, 2024, Ms. Rossi reported that she continued to have a depressed mood, but stated that her depression was moderate and that her symptoms were manageable. (Tr. 2081). She declined any adjustments to her medication. *Id*. On examination, she displayed a depressed mood and depressed thought content without suicidal or homicidal ideation. (Tr. 2083). Her mental status examination was otherwise normal. *Id*. It was noted that she had diagnoses of ADHD, generalized

anxiety disorder, posttraumatic stress disorder, and recurrent major depressive disorder. (Tr. 2084).

At an annual physical on October 9, 2024, Ms. Rossi reported that her depression and anxiety were well-managed with Prozac and that she was following up with psychology for management of her behavioral health. (Tr. 1597).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Rossi met the insured status requirements of the Social Security Act through March 31, 2023. (Tr. 1392). The ALJ further determined that Ms. Rossi had not been engaged in any gainful activity since November 15, 2020, the alleged onset date. *Id*.

The ALJ next determined that Ms. Rossi had the following severe impairments: degenerative disease of the lumbar spine, spondylosis without myelopathy or radiculopathy; fibromyalgia; migraines; obesity; unspecified bipolar disorder; unspecified anxiety disorder; and posttraumatic stress disorder (PTSD). *Id*. The ALJ found, however, that none of Ms. Rossi's severe impairments, whether considered singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.

The ALJ next determined that Ms. Rossi had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except standing and walking limited to four hours in an eight hour workday; occasional climbing of ramps and stairs, no ladders, ropes or scaffolds; occasional stooping, kneeling, crouching and crawling; no work around unprotected heights, dangerous machinery or commercial driving and the claimant is limited to simple tasks, simple instructions; few, if any, changes; no strict production quotas, i.e. assembly line work; interaction with others is limited to simple work related decisions so no arbitration, negotiation or supervisory responsibilities[.]

(Tr. 1396).

The ALJ next found that Ms. Rossi had no past relevant work. (Tr. 1400). However, the ALJ also found that Ms. Rossi could perform jobs that exist in significant numbers in the national

economy, including work as an order caller, collator operator, and interviewer. (Tr. 1401). Accordingly, the ALJ determined that Ms. Rossi was not disabled. *Id*.

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA

14

fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.   Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[2]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*,

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.  Analysis

#### 1.  *The ALJ's Step Two Analysis*

Ms. Rossi first argues that the ALJ erred at Step Two because the ALJ failed to properly evaluate all of her impairments. Ms. Rossi's Step Two argument has two components. First, she argues that, despite finding that Ms. Rossi suffered from a severe impairment of fibromyalgia, the ALJ did not properly evaluate the limitations her fibromyalgia imposed. Second, Ms. Rossi argues that the ALJ erred because the ALJ failed to find that her dizziness was a severe impairment.

##### a.  *Fibromyalgia*

Ms. Rossi first argues that the ALJ failed to properly evaluate her fibromyalgia under

Social Security Ruling ("SSR") 12-2p, which sets forth the procedure an ALJ must follow in claims involving fibromyalgia.[3] SSR 12-2p provides that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations" that prevent a person from performing a full range of unskilled work. 2012 WL 3104869, at *6 (July 25, 2012). SSR 12-2p also states that people with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id.*

In addition, SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. It provides that, once the ALJ determines that a claimant has a medically determinable impairment of fibromyalgia, the ALJ must proceed to evaluate fibromyalgia under the traditional five-step process. *Id.* at *5. In doing so, the ALJ must also evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. *Id.* First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* SSR 12-2p also provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.[4]

---

[3] While Ms. Rossi characterizes this as a Step Two issue, the ALJ found that Ms. Rossi's fibromyalgia was a severe impairment at Step Two. (Tr. 1392). Thus, rather than disputing the ALJ's Step Two finding, Ms. Rossi is instead arguing that the ALJ erred in failing to incorporate greater restrictions into her RFC prior to Step Four.

[4] The Commissioner argues that Ms. Rossi's reliance on SSR 12-2p is misplaced because SSR 12-2p deals primarily with the Step Two determination of whether fibromyalgia is a medically determinable impairment. To the extent the Commissioner is arguing that SSR 12-2p is of minimal relevance to the remaining steps of the sequential evaluation process, the Commissioner's argument is not well-taken. Rather, "SSR 12-2p states that fibromyalgia should be analyzed under the traditional five-step evaluation process and provides binding guidance for all steps of the process that the ALJ must follow." *Kado v. Colvin*, No. 1:15-cv-02044-DAP, 2016 WL 6067779, at *6 (N.D. Ohio Oct. 17, 2016); *see also Fox v. Comm'r of Soc. Sec.*, No. 5:19CV1301, 2020 WL 6568379, at *8 (N.D. Ohio July 8, 2020), *report and recommendation adopted*, 2020 WL 4499779 (N.D. Ohio Aug. 5, 2020).

Importantly, although "the same factors are applied to fibromyalgia as to any [medically determinable impairment], caselaw demonstrates that [t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis." *James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 4172932, at *14 (N.D. Ohio June 5, 2023) (quotations omitted). That is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).

Moreover, because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.* No. 1:21-CV-01309-SO, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022). As the Sixth Circuit has held, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers*, 486 F.3d at 248.

Here, Ms. Rossi testified at both administrative hearings that her fibromyalgia causes her to experience pain throughout her body, that treatments other than medical marijuana (and sometimes chiropractic care) have not been effective, and that her fibromyalgia has made the treatment of her back pain more difficult, including by frustrating her ability to get back surgery. (Tr. 42, 1416-17). At least some of Ms. Rossi's treatment records support those statements. *See*, *e.g.*, Tr. 510 (noting that Ms. Rossi's fibromyalgia complicated the treatment of her back pain and that there were no obvious medication options for her fibromyalgia).

18

When formulating the RFC, the ALJ acknowledged Ms. Rossi's subjective fibromyalgia complaints, then addressed them as follows:

> The record notes that the claimant also has a diagnosis of fibromyalgia (Exhibits 1F, pp. 9, 15, 52; 9F, p. 2). However, physical examinations in the record have consistently been normal and have noted normal muscle strength at 5/5, intact sensation and normal reflexes at 2+. She also has a normal gait (Exhibits 1F, pp. 26, 35, 45; 3F, p. 18; 10F, pp. 30, 108, 175). Treatment has included chiropractic care, physical therapy, and epidural injections (Exhibits 1F, pp. 15, 24, 44; 3F, p. 13; 5F). She has also been prescribed medical marijuana (Exhibits 1F, p. 9; 7F, p. 10; 9F, p. 2; 11F, p. 16).

(Tr. 1397).

I agree with Ms. Rossi that the ALJ failed to properly evaluate her fibromyalgia, including her subjective reports regarding her condition. Because fibromyalgia presents without objectively alarming signs, "the Sixth Circuit has described the lack of corroborative findings as 'basically irrelevant' in the context of analyzing fibromyalgia symptoms." *Fyffe v. Comm'r of Soc. Sec.*, No. 1:21-cv-332, 2022 WL 2176538, at *10 (N.D. Ohio June 16, 2022) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011)). Nonetheless, the ALJ appears to have discounted Ms. Rossi's fibromyalgia primarily—if not exclusively—because her physical examinations were normal.

It is true that an ALJ's reliance on a lack of objective findings may not require remand where the ALJ also relies on other considerations such as a claimant's activities of daily living or improvement with treatment. *See, e.g., Hardman v. Berryhill*, No. 5:16CV2795, 2018 WL 1545707, at *17-18 (N.D. Ohio Mar. 5, 2018) (holding that ALJ's reliance on relatively benign clinical findings did not constitute reversible error where ALJ also relied on improvement on claimant's condition and claimant's testimony regarding activities of daily living). Here, however, the ALJ did not rely on Ms. Rossi's activities of daily living or other evidence in the record to determine that a more-restrictive RFC was unwarranted.

19

Moreover, while the ALJ noted that Ms. Rossi treated her fibromyalgia with chiropractic care, physical therapy, epidural injections, and medical marijuana, the ALJ did not indicate what, if any, conclusions he drew from that treatment. It is thus unclear to me whether the ALJ found that Ms. Rossi's fibromyalgia was controlled with treatment. Notably, some of the records that the ALJ cited in his analysis indicated that Ms. Rossi's fibromyalgia may not have been well-controlled. *See*, *e.g.*, Tr. 290 (noting that Ms. Rossi had previously taken amitriptyline, Cymbalta, and gabapentin for fibromyalgia, but that none of those medications provided relief and that only medical marijuana helped); Tr. 326 (noting that Ms. Rossi reported her chronic back pain and fibromyalgia "was never nearly this bad"); Tr. 510 (noting that her fibromyalgia complicated treatment of her back pain and that there was "no obvious next step for medications for fibromyalgia").

The Commissioner also argues that substantial evidence supports the ALJ's decision because the state agency medical consultants concluded that Ms. Rossi could perform a limited range of light work despite opining that Ms. Rossi's fibromyalgia was a severe impairment. According to the Commissioner, by including those limitations, "the ALJ accommodated any limitations that resulted from [Ms. Rossi's] fibromyalgia . . . ." (ECF No. 9, PageID # 2630). However, the ALJ did not discuss the opinion of either state agency medical consultant when evaluating Ms. Rossi's fibromyalgia. Nor did the ALJ discuss fibromyalgia when evaluating the state agency medical consultants' opinions. Instead, the ALJ said only that Ms. Rossi did not display objectively alarming signs and that she received certain treatment for her fibromyalgia.

In sum, the ALJ's decision does not adequately explain why he discounted Ms. Rossi's subjective complaints regarding her fibromyalgia in light of the unique nature of that condition. Remand is therefore warranted. *See Cooper v. Comm'r of Soc. Sec.*, No. 3:22-CV-01248-JRK, 2023 WL 4078982, at *14 (N.D. Ohio May 3, 2023) ("The Sixth Circuit's ruling in *Rogers* requires

a district court remand where an ALJ considering fibromyalgia dismisses a claimant's subjective statements in favor of objective findings."), *report and recommendation adopted*, 2023 WL 4699650 (N.D. Ohio July 24, 2023); *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 WL 836493, at *7-8 (N.D. Ohio Feb. 20, 2020) (holding that lack of objective evidence "does not provide a sufficient rationale for discounting fibromyalgia symptoms" and remanding in light of "Plaintiff's complaints of chronic pain [and] the ALJ's repeated focus on the 'objective medical evidence'); *Jones*, 2022 WL 3567412, at *12 ("The ALJ's articulated reasons for rejecting [claimant's] fibromyalgia diagnosis as 'self-reported' and otherwise not supported by objective findings such as exhibiting normal strength and range-of-motion testing do not constitute substantial evidence supporting the ALJ's RFC finding,").

None of this is to say that Ms. Rossi is necessarily disabled. To the contrary, the Sixth Circuit has held that a diagnosis of fibromyalgia "does not automatically entitle [the claimant] to disability benefits . . . ." *Vance v. Comm'r of Soc. Sec.*, 260 F. Appx. 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority." *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996). But governing law required the ALJ to evaluate Ms. Rossi's fibromyalgia without placing undue weight on the lack of objective evidence during physical examinations. Because the ALJ failed to do so here, I recommend that the Court remand the case to the Commissioner for further consideration of Ms. Rossi's fibromyalgia.

### b. *Dizziness*

Ms. Rossi also argues that the ALJ erred at Step Two because the ALJ did not find that her dizziness constituted a medically determinable impairment. Ms. Rossi is correct that the ALJ did not find that her dizziness constituted either a severe or a non-severe impairment. (Tr. 1392). As the Commissioner correctly argues, however, when an ALJ finds severe impairments

at Step Two and continues to evaluate non-severe impairments at Step Four, any error at Step Two is harmless. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (ALJ's finding that some impairments were not severe was "legally irrelevant" where ALJ found other severe impairments and considered both severe and non-severe impairments in remaining steps of sequential analysis).

Here, while the ALJ did not find that Ms. Rossi's dizziness was a medically determinable impairment, the ALJ did find that Ms. Rossi suffered from several severe impairments and proceeded beyond the second step of the sequential evaluation process. And, in formulating Ms. Rossi's RFC, the ALJ expressly addressed her dizziness:

> The claimant further alleges that she is disabled by migraine headaches and dizziness (Exhibit 10F, p. 18). However, a treatment record dated May 24, 2022 noted that the claimant's migraine headaches was well controlled on sumatriptan (Exhibit 4F, p. 11). She also underwent a vestibular evaluation on September 28, 2022 which was normal and an audiologic examination performed at that time was also normal (Exhibit 10F, pp. 443, 457). She also had a normal echocardiogram on October 18, 2022 and a normal EKG on October 9, 2023 (Exhibit 10F, p. 295). A cervical spine x-ray dated March 3, 2021 and an MRI of the cervical spine dated April 5, 2021 were normal (Exhibit 1F, pp. 132, 139-140). More recently, an MRI of the brain dated March 6, 2024 was normal and a CT of the brain dated October 11, 2024 was also normal (Exhibit 10F, pp. 11, 54-55).

(Tr. 1397).

The ALJ thus acknowledged Ms. Rossi's reports of dizziness, but noted that she underwent a number of tests that did not reveal abnormal results. Because the ALJ addressed Ms. Rossi's dizziness at subsequent steps of the sequential evaluation process despite failing to include it as a medically determinable impairment at Step Two, any error is harmless. *See Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF, 2023 WL 6050291, at *11 (N.D. Ohio Aug. 31, 2023) (holding that ALJ's error in finding that dizziness was non-severe was harmless where ALJ analyzed dizziness at subsequent steps of sequential evaluation process), *report and*

*recommendation adopted*, 2023 WL 6049326 (N.D. Ohio Sept. 15, 2023); *Hawkins v. Comm'r of Soc. Sec.*, No. 1:12CV1210, 2013 WL 1947216, at *10 (N.D. Ohio Mar. 19, 2013) (same), *report and recommendation adopted*, 2013 WL 1947185 (N.D. Ohio May 10, 2013).

### 2. *The ALJ's Step Three Analysis of Ms. Rossi's Headaches*

Ms. Rossi next argues that the ALJ erred at Step Three of the sequential evaluation process because the ALJ should have found that her headaches medically equaled Listing 11.02B. The Commissioner responds that substantial evidence supports the ALJ's determination because Ms. Rossi has not shown that she suffered migraine headaches at the frequency required to medically equal the listing. I agree.

The Social Security Agency has promulgated SSR 19-4p to "explain [Agency] policy on how we establish that a person has a[ ] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). The regulations require that the "[medically determinable impairment] be established by objective medical evidence from an acceptable medical source." *Id*. (footnotes omitted).

SSR 19-4p states in relevant part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including

23

all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635 at *7.

The ALJ addressed whether Ms. Rossi's headaches medically equaled Listing 11.02 as follows:

Here, the claimant does not meet the criteria for the listing. While the claimant does not have a seizure disorder, she does experience migraine headaches but not at a frequency required by the listings. In fact, the evidence indicates that her headaches are controlled by medication (Exhibit 4F, p. 11). Further, she does not have evidence of marked limitation in physical functioning. Moreover, as set forth below, she does not have evidence of a marked limitation in understanding, remembering or applying information, in interacting with others, in concentrating, persisting or maintaining pace or in adapting or managing oneself

(Tr. 1394-95).

Because Ms. Rossi challenges only whether her migraine headaches medically equaled Listing 11.02B, the ALJ's determination that she does not have evidence of a marked limitation is not relevant to the analysis, as marked limitations are a requirement only for Listings 11.02C and 11.02D. Listing 11.02B instead requires only that a claimant experience dyscognitive seizures occurring at least once per week for at least three consecutive months despite adherence to prescribed treatment.

Substantial evidence supports the ALJ's determination that Ms. Rossi failed to show that she suffered headaches at the required frequency. Ms. Rossi cites to several treatment records showing that she suffered from frequent migraines. However, none of those records establish that Ms. Rossi suffered from migraines at least once per week for at least three consecutive months.

24

In November 2022, Ms. Rossi reported that she had a "history" of migraines, and that she suffered them "more often of late; once or twice a week." (Tr. 2010-11). The records Ms. Rossi cites do not explain what she meant by "more often of late" and do not show that she had experienced weekly migraines for at least three months. Similarly, in August 2023, Ms. Rossi went to the emergency room, saying that she had been suffering from a migraine for five days. (Tr. 1605). However, the treatment notes do not provide any other information about the frequency of Ms. Rossi's migraines. *Id*.

Ms. Rossi next relies on records from a neurology follow-up visit on October 2, 2024. (Tr. 1627). During that visit, she reported that she has experienced migraines since she was young. *Id*. Again, however, the treatment records do not indicate how frequently Ms. Rossi experienced migraines. A week later, Ms. Rossi reported that "in the last few weeks" she had experienced five migraines per week. (Tr. 1597). In late October and early November 2024, treatment records reflect that Ms. Rossi had to lie down during virtual psychotherapy sessions due to migraines, but those records do not state how frequently Ms. Rossi was experiencing migraines at that time. (Tr. 2553, 2557).

Thus, treatment records reflect that Ms. Rossi experienced migraine headaches and that, at points, she had them multiple times per week. But she has not identified any evidence from an acceptable medical source establishing that she experienced migraines at least once per week for three consecutive months as SSR 19-4p requires. *See* SSR 19-4p, 2019 WL 4169625, at *7 (requiring "a detailed description from an [acceptable medical source] of a typical headache event, including . . . the frequency of headache events"). The ALJ therefore did not err in concluding that Ms. Rossi failed to demonstrate that she medically equaled Listing 11.02B.

### 3. *SSR 16-3p*

Finally, Ms. Rossi argues that the ALJ failed to properly evaluate her subjective symptom

reports. With the exception of Ms. Rossi's fibromyalgia, her argument is not well-taken.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7-8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec. Admin*., No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers,* 486 F.3d at 249.

As discussed above, the ALJ failed to properly evaluate Ms. Rossi's fibromyalgia, including her subjective complaints of pain and fatigue, because the ALJ relied primarily on the lack of objective evidence. However, Ms. Rossi has not shown that the ALJ otherwise failed to properly evaluate her subjective complaints. Instead, she cites to her own testimony and treatment records regarding her headaches, dizziness, back pain, and mental health conditions that she believes should have led the ALJ to adopt a more-restrictive RFC. But "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Substantial evidence supports the ALJ's determination here. The ALJ summarized treatment records regarding Ms. Rossi's headaches, dizziness, back pain, and mental health conditions, concluding that Ms. Rossi's statements were not entirely consistent with the evidence of record. (Tr. 1397-99). With the exception of her fibromyalgia, Ms. Rossi has not shown that the ALJ's determination was erroneous, and her third assignment of error is not well-taken. *See Young v. Comm'r of Soc. Sec. Admin.*, No. 5:21-cv-00761, 2022 WL 17546359, at *6 (N.D. Ohio Dec. 9,

2022) (holding that ALJ complied with SSR 16-3p where ALJ evaluated the intensity and persistence of claimant's symptoms and determined extent to which those symptoms limited claimant's ability to perform work activities); *Myers v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02381-SL, 2022 WL 18636593, at *10-11 (N.D. Ohio Dec. 2, 2022) (holding that ALJ complied with SSR 16-3p where ALJ considered claimant's subjective complaints of pain but did not find pain disabling, *report and recommendation adopted*, 2023 WL 369435 (N.D. Ohio Jan. 24, 2023).

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the Commissioner's final decision and REMAND the case to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated: December 18, 2025                                 */s Jennifer Dowdell Armstrong*
                                                          Jennifer Dowdell Armstrong
                                                          U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may

consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

   *Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).